E-FILED; Baltimore County Circuit Court
Docket: 10/24/2023 3:17 PM; Submission: 10/24/2023 3:17 PM
Envelope: 14314603

**IN THE CIRCUIT COURT
OF MARYLAND
BALTIMORE COUNTY**

| | |
|---|---|
| IN RE ADVANCED MEDICAL MANAGEMENT DATA BREACH LITIGATION | Lead Case No. C-03-CV-23-002826 |

**PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Anthony Brent, Oluwakemi Ade-Fosudo, James Buechler, Desiree Walker, and Confidence Dike ("Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against defendants Advanced Medical Management, LLC ("AMM") and Points Group, LLC ("Points Group") (collectively, "Defendants") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by their counsel and review of public documents as to all other matters:

**I.    INTRODUCTION**

1.      This class action arises out of the recent cyberattack and data breach ("Data Breach") resulting from Defendants' failure to implement reasonable and industry standard data security practices.

2.      Defendant AMM provides management and administrative services to healthcare entities and, in course of providing those services, collected and maintained certain personally identifiable information of Plaintiffs and the putative Class Members (defined below), who are (or were) patients at Defendants and/or a healthcare entity that contracted with Defendants for the provision of services.

3.      Defendant Points Group provides strategy, consulting, and marketing services to businesses and healthcare providers. One of the clients Points Group serves is AMM. Upon

- 1 -

information and belief, Defendant Points Group developed and assisted in maintaining the software platform that was the subject of the Data Breach.

4.     Plaintiffs and the Class Members (as further defined below) have had their personally identifiable information exposed as a result of Defendants' inadequately secured computer network.  Defendants betrayed their obligations to Plaintiff sand the other Class Members by failing to properly safeguard and protect their personally identifiable information and thereby enabling cybercriminals to steal such valuable and sensitive information.

5.     The information compromised in the Data Breach included Plaintiffs' and Class Members' full names, addresses, email, dates of birth, Social Security numbers, driver's license, ("personally identifiable information" or "PII") and medical and health insurance information, which is protected health information ("PHI", and collectively with PII, "Private Information") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

6.     The Private Information compromised in the Data Breach was exfiltrated by cyber-criminals and remains in the hands of those cyber-criminals who targeted the Private Information for its value to identity thieves.

7.     As a result of the Data Breach, Plaintiffs and approximately 319,000 Class Members,[1] suffered concrete injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) an increase in spam calls,

---

[1] According to the breach report submitted to the U.S. Department of Health and Human Services, 319,485 persons were impacted in the Data Breach. *See* https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Sep. 25, 2023).

texts, and/or emails; (viii) Plaintiff Brent's and Plaintiff Dike's Private Information being disseminated on the dark web; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

8.     The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect their patients' and their clients' patients' Private Information from a foreseeable and preventable cyber-attack.

9.     Defendants maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendants' computer network and/or software platform in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendants, and thus, Defendants were on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

10.     Defendants disregarded the rights of Plaintiffs and Class Members by, inter alia, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure their data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust computer systems and security practices to safeguard Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

11.     Plaintiffs' and Class Members' identities are now at risk because of Defendants' negligent conduct because the Private Information that Defendants collected and maintained is now in the hands of data thieves.

12.     Armed with the Private Information accessed in the Data Breach, data thieves have already engaged in identity theft and fraud and can in the future commit a variety of crimes including, e.g., opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

13.     As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

14.     Plaintiffs and Class Members may also incur out of pocket costs, e.g., for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

15.     Plaintiffs bring this class action lawsuit on behalf all those similarly situated to address Defendants' inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

16.     Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

17.     Plaintiff seek remedies including, but not limited to, compensatory damages and injunctive relief including improvements to Defendants' data security systems, future annual audits, and adequate credit monitoring services funded by Defendants.

## II.     PARTIES

18.     Plaintiff **Anthony Brent** is, and at all times mentioned herein was, an individual citizen of the State of Maryland.

19.     Plaintiff **Oluwakemi Ade-Fosudo** is, and at all times mentioned herein was, an individual citizen of the State of Maryland.

20.     Plaintiff **James Buechler** is, and at all times mentioned herein was, an individual citizen of the State of Maryland.

21.     Plaintiff **Desiree Walker** is, and at all times mentioned herein was, an individual citizen of the State of Maryland.

22.     Plaintiff **Confidence Dike** is, and at all times mentioned herein was, an individual citizen of the State of Maryland.

23.     Defendant **Advanced Medical Management, LLC** is a Maryland limited liability company with its principal place of business located at 901 Eastern Blvd., Suite 101, Baltimore, MD 21221.

24.     Defendant **Points Group, LLC** is a New Jersey limited liability company with its principal place of business located at 28 Twinbrooks Trail, Chester, NJ 07930.

### III.      JURISDICTION AND VENUE

25.      This Court has subject-matter jurisdiction pursuant to Md. Code Ann., Cts. & Jud. Proc. § 1-501.

26.      This Court has personal jurisdiction over AMM because AMM's principal place of business is located in Baltimore County, it is incorporated in Maryland, and it conducts substantial business in Baltimore County.[2] The Court has personal jurisdiction over Points Group because conducts a substantial business in Baltimore County, including the business it conducts with AMM.

27.      Venue properly lies in this Court pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-201 because AMM maintains its principal place of business in Baltimore County, regularly conducts substantial business in Baltimore County, and/or is registered to conduct business in the State of Maryland. Points Group also regularly conducts substantial business in Baltimore County.

### IV.      FACTUAL ALLEGATIONS

#### A.      *Defendants' Business and The Data Breach*

28.      AMM provides operational, administrative, and technical healthcare management services to healthcare organizations.

29.      Defendant Points Group provides strategy, consulting, and marketing services to businesses and healthcare providers. Upon information and belief, Defendant Points Group developed and assisted in maintaining the software platform that was the subject of the Data Breach.

30.      In the course of their relationship, patients at AMM and/or AMM's clients, including Plaintiffs and Class Members, provided Defendants, directly or indirectly, with at least

---

[2] *See* Md. Code Ann., Cts. & Jud. Proc. § 6-102.

the following information: names, dates of birth, addresses, emails, Social Security numbers, driver's licenses, health insurance information, and medical treatment and/or diagnosis information.

31.     In the Notice of Data Breach letters sent to Plaintiffs and Class Members (the "Notice Letter"), AMM asserts that: "[o]n May 11, 2023, AMM became aware of unauthorized activity to certain systems within its network." Upon discovering the Data Breach, AMM purports to have "promptly launched a comprehensive investigation with the assistance of third-party cybersecurity experts" to determine the nature and scope of the Data Breach. AMM's investigation concluded—on or about June 22, 2023--that "an unauthorized party gained access to certain databases containing PHI between May 10, 2023, and May 13, 2023."

32.     Omitted from the Notice Letter were the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these omitted details have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

33.     Upon information and belief, the cyberattack was targeted at AMM, due to its status as a healthcare entity service provider that collects, creates, and maintains its patients' and its clients' patients' Private Information on its computer networks and/or systems.

34.     As AMM's Notice Letter admits, Plaintiffs' and Class Members' Private Information was, in fact, compromised and acquired in the Data Breach.

35.     The files containing Plaintiffs' and Class Members' Private Information, that were targeted and stolen from Defendants, included their names, dates of birth, addresses, emails, Social Security numbers, driver's licenses, health insurance information, and certain medical information.

36.     Because of this targeted cyberattack, data thieves were able to gain access to and obtain data from Defendants that included the Private Information of Plaintiffs and Class Members.

37.     As evidenced by the Data Breach's occurrence, the Private Information contained in Defendants' network was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

38.     Plaintiffs' Private Information was accessed and stolen in the Data Breach. Moreover, Plaintiff Brent and Plaintiff Dike have come to learn that their stolen Private Information is currently available for sale on the dark web, following the Data Breach.

39.     Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must, as AMM's Notice Letter instructs,[3] "remain vigilant" and monitor their financial accounts for many years to mitigate the risk of identity theft.

40.     In the Notice Letter, AMM makes an offer of 12 months of identity monitoring services. This is wholly inadequate to compensate Plaintiffs and Class Members as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, medical and financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' Private Information.

41.     That AMM is encouraging victims of the Data Breach to enroll in credit monitoring and identity theft restoration services is an acknowledgment that the impacted individuals' Private Information was acquired, thereby subjecting Plaintiffs and Class Members to a substantial and imminent threat of fraud and identity theft.

---

[3] Notice Letter.

42.     Defendants had obligations created by the FTC Act, HIPAA, contract, state and federal law, common law, and industry standards to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

**B.     *Data Breaches Are Preventable***

43.     Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

44.     Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

45.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[4]

46.     To prevent and detect cyber-attacks and/or ransomware attacks Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, patients and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

---

[4] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Aug. 23, 2021).

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[5]

---

[5] *Id.* at 3-4.

47.     To prevent and detect cyber-attacks or ransomware attacks Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

-     Apply latest security updates
-     Use threat and vulnerability management
-     Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

-     Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

-     Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

-     Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

-     Monitor for adversarial activities
-     Hunt for brute force attempts
-     Monitor for cleanup of Event Logs
-     Analyze logon events;

**Harden infrastructure**

-     Use Windows Defender Firewall
-     Enable tamper protection
-     Enable cloud-delivered protection
-     Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[6]

---

[6] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Nov. 11, 2021).

48.     Given that Defendants were storing the sensitive Private Information of AMM's current and former patients as well as their clients' current and former patients, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks.

49.     The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the unencrypted Private Information of over 319,000 patients,[7] including that of Plaintiffs and Class Members.

**C.      Defendants Acquire, Collect, and Store Plaintiffs' and Class Members' Private Information**

50.     Defendants acquire, collect, and store a massive amount of Private Information in the regular course of their business.

51.     As a condition of obtaining medical services or products at AMM and/or AMM's clients, AMM requires that patients, former patients, and other personnel—including Plaintiffs and Class Members—entrust it with highly sensitive personal information.

52.     Companies providing services to the healthcare industry, such as Points Group, was obligated to reasonably protect the highly sensitive Private Information it assisted in storing and maintaining.

53.     By obtaining, collecting, and using Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

---

[7] *See* https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Sep. 25, 2023).

54.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to Defendants absent an implied promise to safeguard that information.

55.     Plaintiffs and the Class Members relied on Defendants to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

**D.      *Defendants Knew or Should Have Known of the Risk Because Healthcare Entities in Possession Of Private information Are Particularly Suspectable To Cyber Attacks***

56.     Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting healthcare entities that collect and store Private Information, like Defendants, preceding the date of the breach.

57.     Data breaches, including those perpetrated against healthcare entities, and companies providing services to healthcare entities, that store Private Information in their systems, have become widespread.

58.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[8]

59.     In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite

---

[8] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6.

Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

60.     Indeed, cyber-attacks, such as the one experienced by Defendants, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals...because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[9]

61.     At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

62.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

63.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

---

[9] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection (last accessed Oct. 17, 2022).

64.     The ramifications of Defendants' failure to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen—particularly Social Security numbers and PHI—fraudulent use of that information and damage to victims may continue for years.

**E.     *Value of Private Information***

65.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[10] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[11]

66.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[12]

67.     For example, Personal Information can be sold at a price ranging from $40 to $200.[13] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[14]

---

[10] 17 C.F.R. § 248.201 (2013).

[11] *Id.*

[12] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 17, 2022).

[13] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 17, 2022).

[14] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Oct. 217, 2022).

68.     For example, Social Security numbers are among the worst kind of Private Information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiffs and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[15]

69.     What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

70.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[16]

71.     Theft of PHI is gravely serious: "[a] thief may use your name or health insurance

---

[15] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Oct. 17, 2022).

[16] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthems-hackers-has-millionsworrying-about-identity-theft (last visited Oct. 17, 2022).

numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[17]

72.     According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.[18]

73.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security number, PHI, and name.

74.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[19]

75.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

---

[17] *What To Know About Medical Identity Theft,* Federal Trade Commission, (May 2021), *available at* https://consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited Aug. 3, 2023).

[18] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last accessed July 20, 2021)

[19] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Oct. 17, 2022).

76.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[20]

77.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

### F.     Defendants Fail to Comply with FTC Guidelines

78.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

79.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks;

---

[20] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Oct. 17, 2022).

understand their network's vulnerabilities; and implement policies to correct any security problems.[21]

80.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[22]

81.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

82.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

83.     These FTC enforcement actions include actions against healthcare entities, like Defendants. *See, e.g., In the Matter of LabMD, Inc., a corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's

---

[21] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Oct. 17, 2022).
[22] *Id.*

data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

84.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

85.     Defendants failed to properly implement basic data security practices.

86.     Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

87.     Upon information and belief, Defendants were at all times fully aware of their obligation to protect the Private Information of their patients' and their clients' patients. Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

**G.     *Defendants Fail to Comply with HIPAA Guidelines***

88.     Defendants were covered business associates under HIPAA (45 C.F.R. § 160.103) and are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health

Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

89.     Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[23] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

90.     HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

91.     HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

92.     HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

93.     "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

94.     HIPAA's Security Rule requires Defendants to do the following:

   a.   Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

---

[23] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

b.  Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c.  Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d.  Ensure compliance by their workforce.

95.  HIPAA also requires Defendants to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendants are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

96.  HIPAA and HITECH also obligated Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

97.  The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendants to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."[24]

---

[24] Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added).

98.     HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

99.     HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

100.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[25] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[26]

---

[25] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.
[26] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html

H. *Defendants fail to Comply with Industry Standards*

101.    As noted above, experts studying cyber security routinely identify entities in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

102.    Several best practices have been identified that, at a minimum, should be implemented by healthcare entities in possession of Private Information, like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendants failed to follow these industry best practices, including a failure to implement multi-factor authentication.

103.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendants failed to follow these cybersecurity best practices, including failure to train staff.

104.    Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

105.     These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and upon information and belief, Defendants failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

**I.     *Common Injuries & Damages***

106.     As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) loss of time due to increased spam and targeted marketing emails; (e) the loss of benefit of the bargain (price premium damages); (f) diminution of value of their Private Information; and (g) the continued risk to their Private Information, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

**J.     *The Data Breach Increases Victims' Risk of Identity Theft***

107.     As Plaintiff Brent and Plaintiff Dike have already experienced, the unencrypted Private Information of Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

108.     Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs

and Class Members. Simply, unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members.

109.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

110.    Plaintiffs' and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit off their misfortune.

111.    Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

112.    In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

113.    One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[27]

114.    With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

115.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

---

[27] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm,* Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance- finn/ (last visited on May 26, 2023).

116.    The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like phone numbers and emails) of Plaintiffs and the other Class Members.

117.    Thus, even if certain information (such as emails or telephone numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

**K.    *Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

118.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

119.    Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must, as Defendants' Notice Letter instructs,[28] "remain vigilant" and monitor their financial accounts for many years to mitigate the risk of identity theft.

120.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter, contacting financial institutions to ensure their financial accounts are secured, exploring credit monitoring and identity theft insurance options, seeking

---

[28] Notice Letter.

legal counsel regarding their options for remedying and/or mitigating the effects of the Data Breach, researching how best to ensure that they are protected from identity theft, reviewing account statements and other information for any indication of fraudulent activity, which may take years to detect.

121.    Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[29]

122.    Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[30]

**L.    *Diminution of Value of PII and PHI***

123.    PII and PHI are valuable property rights.[31] Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison

---

[29] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[30] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited July 7, 2022).

[31] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Sep. 13, 2022) ("GAO Report").

sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

124.    Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[32]

125.    An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[33] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[34,35] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[36]

126.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

---

[32] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[33] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Sep. 13, 2022).

[34] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[35] https://datacoup.com/

[36] https://digi.me/what-is-digime/

127.    At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

128.    The fraudulent activity resulting from the Data Breach may not come to light for years.

129.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information .

130.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network, amounting to potentially over three hundred thousand individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

131.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

**M.**    ***Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary***

132.    Given the type of targeted attack in this case, sophisticated criminal activity, the type of Private Information involved, the volume of Private Information impacted in the Data Breach, and Plaintiff Brent and Plaintiff Dike already been informed that their Private Information has been disseminated on the dark web, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and

purchase by criminals intending to utilize the Private Information for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

133.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or his Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

134.    Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

135.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information .

### N.    *Loss of Benefit of the Bargain*

136.    Furthermore, Defendants' poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to pay Defendants and/or Defendants' clients for medical services, Plaintiffs and other reasonable consumers understood and expected that they were, in part, paying for the service that provided the necessary data security to protect their Private Information, when in fact, Defendants did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what

they reasonably expected to receive under the bargains they struck with Defendants and/or Defendants' clients.

## PLAINTIFFS' EXPERIENCES

### Plaintiff Anthony Brent

137.     Plaintiff Anthony Brent obtained medical services at a medical facility, which contracted with AMM, in or about 2020.

138.     In order to obtain medical services through AMM, he was required to provide his Private Information, indirectly or directly, to AMM.

139.     Upon information and belief, at the time of the Data Breach, AMM retained Plaintiff's Private Information in its system. Upon information and belief, Points Group developed and assisted in maintaining the software platform used by AMM that was the subject of the Data Breach.

140.     Plaintiff Brent is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted his Private Information to Defendants had he known of Defendants' lax data security policies.

141.     Plaintiff Brent received the Notice Letter, by U.S. mail, directly from AMM, dated June 29, 2023. According to the Notice Letter, Plaintiff's PII and PHI was improperly accessed and obtained by unauthorized third parties, including his name, address, email, Social Security number, date of birth, driver's license, treatment or diagnosis information, provider name, dates of service, account number, guarantor ID, policy number, health insurance information, health insurance policy number, and treatment cost information.

142.     As a result of the Data Breach, and at the direction of AMM's Notice Letter, Plaintiff Brent made reasonable efforts to mitigate the impact of the Data Breach, including contacting his bank to ensure his financial accounts are secured. Plaintiff has spent significant time dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

143.     Plaintiff Brent suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to: (i) lost or diminished value of his Private Information; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

144.     Plaintiff Brent further suffered actual injury in the form of his Private Information being disseminated on the dark web, which, upon information and belief, was caused by the Data Breach.

145.     Plaintiff Brent also suffered actual injury in the form experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

146.     The Data Breach has caused Plaintiff Brent to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants has still not fully informed him of key details about the Data Breach's occurrence.

147.     As a result of the Data Breach, Plaintiff Brent anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

148.     As a result of the Data Breach, Plaintiff Brent is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

149.     Plaintiff Anthony Brent has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### *Plaintiff Oluwakemi Ade-Fosudo*

150.     Plaintiff Oluwakemi Ade-Fosudo was a client of AMM, and their information was stored with Defendants as a result of their dealings with AMM.

151.     As required in order to obtain services from AMM, Plaintiff Ade-Fosudo provided AMM with highly sensitive personal, financial, health, and insurance information, who then possessed and controlled it. Upon information and belief, Points Group developed and assisted in maintaining the software platform used by AMM that was the subject of the Data Breach.

152.     As a result, Plaintiff Ade-Fosudo's information was among the data accessed by an unauthorized third-party in the Data Breach.

153.     Plaintiff Ade-Fosudo received the Notice Letter from AMM, dated June 29, 2023, stating that their Private Information was involved in the Data Breach.

154.     Plaintiff Ade-Fosudo was unaware of the Data Breach—or even that Defendants had possession of their data until receiving that letter.

155.     As a result, Plaintiff Ade-Fosudo was injured in the form of lost time dealing with the consequences of the Data Breach, which included and continues to include: time spent verifying the legitimacy and impact of the Data Breach; time spent exploring credit monitoring and identity theft insurance options; time spent self- monitoring her accounts with heightened scrutiny and time spent seeking legal counsel regarding their options for remedying and/or mitigating the effects of the Data Breach.

156.     Plaintiff Ade-Fosudo was also injured by the material risk to future harm she suffers based on Defendants' breach; this risk is imminent and substantial because Plaintiff's data has been exposed in the breach, the data involved, including her Social Security numbers and healthcare information, is highly sensitive and presents a high risk of identity theft or fraud; and it is likely that some of the Class's information that has been exposed has already been misused.

157.     Plaintiff Ade-Fosudo suffered actual injury in the form of damages to and diminution in the value of her Private Information—a condition of intangible property that they entrusted to Defendants, which was compromised in and as a result of the Data Breach.

158.     Plaintiff Ade-Fosudo, as a result of the Data Breach, has increased anxiety for their loss of privacy and anxiety over the impact of cybercriminals accessing, using, and selling their Private Information.

159.     Plaintiff Ade-Fosudo has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of unauthorized third parties/criminals.

160.    Plaintiff Ade-Fosudo has a continuing interest in ensuring that their Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

**Plaintiff James Buechler**

161.    When Plaintiff Buechler became a patient of MS-HC, LLC and/or Excelsia PA, PLLC, he was required to provide his Private Information, which was then entrusted to AMM as the management service organization for these healthcare entities. Upon information and belief, Points Group developed and assisted in maintaining the software platform used by AMM that was the subject of the Data Breach.

162.    On or about July 3, 2023, Plaintiff Buechler received the Notice Letter, directly from AMM, which told him that his Private Information had been accessed during the Data Breach. The notice letter informed him that the Private Information stolen included his "name, address, email, phone number, date of birth, Social Security number, driver's license, treatment or diagnosis information, provider name, dates of service, account number, guarantor ID, policy number, health insurance information, health insurance policy number, or treatment cost information."

163.    Plaintiff Buechler suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring his accounts for fraud.

164.    Plaintiff Buechler would not have entrusted Defendants with his Private Information had Defendants timely disclosed that their systems lacked adequate computer and data security practices to safeguard patients' personal and health information from theft, and that those systems were subject to a data breach.

165.    Plaintiff Buechler suffered actual injury in the form of having his Private Information compromised and/or stolen as a result of the Data Breach.

166.    Plaintiff Buechler suffered actual injury in the form of damages to and diminution in the value of his personal, health, and financial information – a form of intangible property that Plaintiff Buechler entrusted to Defendants for the purpose of receiving healthcare services from Defendants' clients, and which was compromised in, and as a result of, the Data Breach.

167.    Plaintiff Buechler suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by his Private Information being placed in the hands of criminals.

168.    Plaintiff Buechler has a continuing interest in ensuring that his Private Information, which remain in the possession of Defendants, are protected and safeguarded from future breaches.

169.    As a result of the Data Breach, Plaintiff Buechler made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered by Defendants. Plaintiff Buechler has spent several hours dealing with the Data Breach, valuable time he otherwise would have spent on other activities.

170.    As a result of the Data Breach, Plaintiff Buechler has suffered anxiety as a result of the release of his Private Information, which he believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using his Private Information for purposes of committing cyber and other crimes against him including, but not limited to, fraud and identity theft. Plaintiff Buechler is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on his life.

171.    Plaintiff Buechler also suffered actual injury from having his Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of his PII and PHI, a form of property that Defendants obtained from Plaintiff Buechler; (b) violation of his privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud he now faces.

172.    As a result of the Data Breach, Plaintiff Buechler anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

173.    In sum, Plaintiff Buechler and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

174.    Plaintiff Buechler and Class Members entrusted their Private Information to Defendants in order to receive healthcare services from Defendants' customers.

175.    Their Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendants' inadequate data security practices.

176.    As a direct and proximate result of Defendants' actions and omissions, Plaintiff Buechler and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having medical services billed in their names, loans opened in their names, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of identity theft.

177.    Further, and as set forth above, as a direct and proximate result of Defendants' conduct, Plaintiff Buechler and Class Members have also been forced to take the time and effort to mitigate the actual and potential impact of the data breach on their everyday lives, including

placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

178.    Plaintiff Buechler and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

179.    Plaintiff Buechler and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiff and Class Members.

180.    The Private Information maintained by and stolen from Defendants' systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiff Buechler and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiff and Class Members.

181.    Additionally, Plaintiff Buechler and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[37] In fact, the data marketplace is so sophisticated that consumers can sell their non-public information directly to a data broker who in turn aggregates the

---

[37] *See* Data Coup, https://datacoup.com/.

information and provides it to other companies.[38] Consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[39]

182.    As a result of the Data Breach, Plaintiff Buechler's and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiff and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiff and the Class Members, thereby causing additional loss of value.

183.    Moreover, Plaintiff Buechler and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

184.    Finally, Plaintiff Buechler and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of Defendants, is protected from future breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing highly sensitive personal and health information of their patients is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

---

[38] *What is digi.me?, DIGI.ME,* https://digi.me/what-is-digime/ (last visited Jan. 16, 2023).
[39] *Frequently Asked Questions,* Nielsen Computer & Mobile Panel, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Jan. 16, 2023).

185.   As a direct and proximate result of Defendants' actions and inactions, Plaintiff Buechler and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

***Plaintiff Desiree Walker***

186.   In exchange for medical services, Plaintiff Walker entrusted her Personal Information to MS-HC, LLC and/or Excelsia PA, PLLC, which was then entrusted to AMM as the management service organization for these healthcare entities. Upon information and belief, AMM's agreements with those entities require it to protect and maintain the confidentiality of Personal Information entrusted to it. Upon information and belief, Points Group developed and assisted in maintaining the software platform used by AMM that was the subject of the Data Breach.

187.   Plaintiff Walker received the Notice Letter, directly from AMM, dated June 29, 2023, informing her that her Private Information—including her name, address, Social Security number, email, date of birth, driver's license, treatment or diagnosis information, provider name, dates of service, guarantor ID, policy number, health insurance information, and treatment cost information—was specifically identified as having been compromised and accessed in the Data Breach.

188.   To the best of her knowledge, Plaintiff Walker has never before been a victim of a data breach.

189.   Plaintiff Walker's and Class members' Personal Information was entrusted to Defendants, either directly or indirectly, with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

190.     Because of the Data Breach, Plaintiff Walker's Personal Information is now in the hands of cyber criminals. Plaintiff and all Class members are now imminently at risk of crippling future identity theft and fraud.

191.     As a result of the Data Breach, Plaintiff Walker has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including investigating the Data Breach, researching how best to ensure that she is protected from identity theft, reviewing account statements and other information, and taking other steps in an attempt to mitigate the harm caused by the Data Breach.

192.     Plaintiff Walker has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Personal Information; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff's Personal Information being placed in the hands of cyber criminals; (c) damages to and diminution in value of Plaintiff's Private Information that was entrusted to Defendants, either directly or indirectly, with the understanding that Defendants would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendants to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff's Personal Information; and (e) continued risk to Plaintiff's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect the Personal Information that was entrusted to Defendants.

### *Plaintiff Confidence Dike*

193.    In recent years, Plaintiff Confidence Dike obtained services at a medical facility that contracted with Defendants.

194.    In order to obtain medical services through AMM, she was required to provide her Private Information, indirectly or directly, to AMM. Upon information and belief, Points Group developed and assisted in maintaining the software platform used by AMM that was the subject of the Data Breach.

195.    Plaintiff Dike is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to Defendants had she known of Defendants' lax data security policies.

196.    Plaintiff Dike received the Notice Letter, by U.S. mail, directly from AMM, dated June 29, 2023. According to the Notice Letter, Plaintiff's PII and PHI was improperly accessed and obtained by unauthorized third parties, including her name, address, email, Social Security number, date of birth, driver's license, treatment or diagnosis information, provider name, dates of service, account number, guarantor ID, policy number, health insurance information, health insurance policy number, and treatment cost information.

197.    As a result of the Data Breach, and at the direction of Defendants' Notice Letter, Plaintiff Dike made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter. Plaintiff has spent significant time dealing with the Data Breach, valuable time Plaintiff otherwise

would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

198.    Plaintiff Dike suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) lost or diminished value of her Private Information; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

199.    In addition, Plaintiff Dike further suffered actual injury in the form of her Private Information being disseminated on the dark web following the Data Breach. Indeed, on August 9, 2023, Plaintiff received a notification from Discover advising her that her first name, last name, date of birth, and Social Security number were located on the dark web. Each of these categories of information was identified in the breach notification letter she received from Defendants as having been potentially accessed by cybercriminals. The next day, August 10, 2023, Plaintiff Dike received a similar notification from Experian IDnotify advising her that her information, including Social Security number, was located on the dark web.

200.    The Data Breach has caused Plaintiff Dike to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants has still not fully informed her of key details about the Data Breach's occurrence.

201.    As a result of the Data Breach, Plaintiff Dike anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

202.    As a result of the Data Breach, Plaintiff Dike is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

203.    Plaintiff Confidence Dike has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

## V.    CLASS ACTION ALLEGATIONS

204.    Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to MD. Rule 2-231.

205.    Specifically, Plaintiffs propose the following Nationwide Class (referred to herein as the "Class" or "Class Members"), subject to amendment as appropriate:

**Nationwide Class**
All individuals who reside in the United States whose Private Information was exposed in the Data Breach involving Defendants (the "Class").

206.    In addition, Plaintiffs propose the following Maryland Subclass, subject to amendment as appropriate:

**Maryland Subclass**
All individuals who reside in Maryland whose Private Information was exposed in the Data Breach involving Defendants (the "Maryland Subclass").

207.    Excluded from the Classes are Defendants and their parents or subsidiaries, any entities in which it has a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

208.    Plaintiffs reserve the right to modify or amend the definitions of the proposed Nationwide Class and/or Maryland Subclass, as well as add subclasses, before the Court determines whether certification is appropriate.

209.    The proposed Classes meet the criteria for certification under Md. Rule 2-231.

210.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of more than 319,000 patients whose data was compromised in the Data Breach.[40] The identities of Class Members are ascertainable through Defendants' records, Class Members' records, publication notice, self-identification, and other means.

211.    <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    Whether Defendants engaged in the conduct alleged herein;

b.    Whether Defendants' conduct violated the FTCA and/or HIPAA;

c.    When Defendants learned of the Data Breach;

d.    Whether Defendants' response to the Data Breach was adequate;

e.    Whether Defendants unlawfully lost or disclosed Plaintiffs' and Class Members' Private Information;

f.    Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

---

[40] *See* https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed Sep. 25, 2023).

g.  Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h.  Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

i.  Whether Defendants owed a duty to Class Members to safeguard their Private Information;

j.  Whether Defendants breached their duty to Class Members to safeguard their Private Information;

k.  Whether hackers obtained Class Members' Private Information via the Data Breach;

l.  Whether Defendants had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and the Class Members;

m.  Whether Defendants breached their duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

n.  Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

o.  What damages Plaintiffs and Class Members suffered as a result of Defendants' misconduct;

p.  Whether Defendants' conduct was negligent;

q.  Whether Defendants' conduct was *per se* negligent;

r.  Whether Defendants were unjustly enriched;

s.  Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages;

    t.   Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

    u.   Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

212.   <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Defendants. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of Class Members arise from the same operative facts and are based on the same legal theories.

213.   <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel are competent and experienced in litigating class actions, including data privacy litigation of this kind.

214.   <u>Predominance</u>. Defendants has engaged in a common course of conduct toward Plaintiffs and Class Members in that all of Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

215.   <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered

in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

216.    Defendants has also acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

217.    Finally, all members of the proposed Class are readily ascertainable. Defendants has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### Negligence
### (On Behalf of Plaintiffs and the Nationwide Class)

218.    Plaintiffs restate and reallege all of the allegations stated above as if fully set forth herein.

219.    Defendants knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in

safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

220.    Defendants knew or should have known of the risks inherent in collecting the Private Information of Plaintiffs and Class Members and the importance of adequate security. Defendants were on notice because, on information and belief, they knew or should have known that they would be an attractive target for cyberattacks.

221.    Defendants owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to it. Defendants' duties included, but were not limited to, the following:

a.   To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in their possession;

b.   To protect patients' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

c.   To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in their possession;

d.   To employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to HIPAA and the FTCA;

e.   To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f.   To promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

222.    Defendants' duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . .

practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

223.    Defendants' duty also arose because Defendants were bound by industry standards to protect their patients' and their clients' patients' confidential Private Information.

224.    Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of Defendants, and Defendants owed them a duty of care to not subject them to an unreasonable risk of harm.

225.    Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within Defendants' possession.

226.    Defendants, by their actions and/or omissions, breached their duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiffs and Class Members.

227.    Defendants, by their actions and/or omissions, breached their duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

228.    Defendants breached their duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

     a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

     b.    Failing to adequately monitor the security of their networks and systems;

    c.   Failing to periodically ensure that their email system maintained reasonable data security safeguards;

    d.   Allowing unauthorized access to Class Members' Private Information; and

    e.   Failing to comply with the FTCA and/or HIPAA.

229.    Defendants had a special relationship with Plaintiffs and Class Members. Plaintiffs' and Class Members' willingness to entrust Defendants with their Private Information was predicated on the understanding that Defendants would take adequate security precautions. Moreover, only Defendants had the ability to protect their systems (and the Private Information that it stored on them) from attack.

230.    Defendants' breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised and exfiltrated, as alleged herein.

231.    As a result of Defendants' ongoing failure to notify Plaintiffs and Class Members regarding exactly what Private Information has been compromised, Plaintiffs and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

232.    Defendants' breaches of duty also caused a substantial, imminent risk to Plaintiffs and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

233.    As a result of Defendants' negligence in breach of their duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

234.    Defendants also had independent duties under state laws that required it to reasonably safeguard Plaintiffs' and Class Members' Private Information and promptly notify them about the Data Breach.

235.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

236.    The injury and harm that Plaintiffs and Class Members suffered was reasonably foreseeable.

237.    Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

238.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**<u>COUNT II</u>**
**Breach of Third-Party Beneficiary Contract**
**(On Behalf of Plaintiffs and the Nationwide Class)**

239.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

240.    Upon information and belief, AMM entered into virtually identical contracts with their healthcare clients, including MS-HC, LLC and Excelsia PA, PLLC, to provide management services to them, which services included data security practices, procedures, and protocols sufficient to safeguard the Private Information that was to be entrusted to it.

241.    Upon information and belief, Points Group entered into a contract with AMM to provide develop and assist AMM in maintaining the software platform that held Plaintiffs' and Class Members' Private Information and that was the subject of the Data Breach.

242.    Such contracts were made expressly for the benefit of Plaintiffs and the Class, as it was their Private Information that Defendants agreed to receive and protect through their services. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiffs and the Class was the direct and primary objective of the contracting parties and Plaintiffs and Class Members were direct and express beneficiaries of such contracts.

243.    Defendants knew that if it were to breach these contracts with their clients, Plaintiffs and the Class would be harmed.

244.    Defendants breached their contracts with their clients and, as a result, Plaintiffs and Class Members were affected by the Data Breach when Defendants failed to use reasonable data security monitoring measures that could have prevented the Data Breach.

245.    As foreseen, Plaintiffs and the Class were harmed by Defendants' failure to use reasonable data security measures to securely store and protect the files in their care, including but not limited to, the continuous and substantial risk of harm through the loss of their Private Information.

246.    Accordingly, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial, along with costs and attorneys' fees incurred in this action.

<u>**COUNT III**</u>
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class)**

247.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

248.    This Count is pleaded in the alternative to the breach of third-party beneficiary contract claim (Count II) above.

249.    Plaintiffs and Class Members conferred a benefit on Defendants by turning over their valuable Private Information to Defendants in exchange for cybersecurity measures sufficient to protect their Private Information from unauthorized access and disclosure. Plaintiffs and Class Members did not receive such protection.

250.    Upon information and belief, Defendants funds their data security measures entirely from their general revenue, including from payments made to it by or on behalf of Plaintiffs and Class Members.

251.    As such, a portion of these payments made to Defendants are to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

252.    Defendants has retained the benefits of their unlawful conduct, including the amounts of payment received from or on behalf of Plaintiffs and Class Members, which payment should have been used for adequate cybersecurity practices that it failed to provide.

253.    Defendants knew that Plaintiffs and Class Members conferred a benefit upon it, which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiffs' and Class Members' Private Information and prevented the Data Breach.

254. If Plaintiffs and Class Members had known that Defendants had not adequately secured their Private Information, they would not have agreed to allow such Private Information to be provided to Defendants.

255. Due to Defendants' conduct alleged herein, it would be unjust and inequitable under the circumstances for Defendants to be permitted to retain the benefit of their wrongful conduct.

256. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) an increase in spam calls, texts, and/or emails; (viii) Plaintiff Brent's and Plaintiff Dike's Private Information being disseminated on the dark web; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

257. Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

258.    Plaintiffs and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT IV**
**Violations of Maryland's Consumer Protection Act and**
**The Maryland Personal Information Act**
*(On Behalf of Plaintiffs and the Maryland Subclass)*

259.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein and bring this claim on behalf of themselves and the Maryland Subclass (the "Class" for the purposes of this count).

260.    This cause of action is brought pursuant to the Maryland Consumer Protection Act, § 13-101, *et seq.* and the Maryland Personal Information Protection Act, § 14-3501, *et seq.*

261.    The purpose of the Maryland Consumer Protection Act is "to set certain minimum statewide standards for the protection of consumers across the State [of] [Maryland]."

262.    The Maryland Personal Information Protection Act was implemented to, among other things, "[t]o protect personal information from unauthorized access, use, modification, or disclosure...of an individual residing in the State [of] [Maryland]."

263.    A violation of the Maryland Personal Information Protection Act "is an unfair or deceptive trade practice."

264.    Defendants has violated the Maryland Personal Information Protection Act and, by extension, the Maryland Consumer Protection Act by engaging in the conduct alleged herein.

265.    Independently, Defendants has violated the Maryland Consumer Protection Act by engaging in the unfair and deceptive practices alleged herein. Pursuant to HIPAA (42 U.S.C. § 1302d *et seq.*), the FTCA, and Maryland law, Defendants were required by law, but failed, to protect Plaintiffs' and the Class's Private Information and maintain adequate and reasonable data

and cybersecurity measures to maintain the security and privacy of Plaintiffs' and Class Members' Private Information. This constitutes a violation of Maryland's Consumer Protection Act.

266.    The damages suffered by Plaintiffs and Class Members were directly and proximately caused by the deceptive, misleading, and unfair practices of Defendants, as described above.

267.    Plaintiffs and Class Members seek declaratory judgment that Defendants' data security practices were not reasonable or adequate and caused the cyberattack under the Maryland CPA, as well as injunctive relief enjoining the above described wrongful acts and practices of Defendants and requiring Defendants to employ and maintain industry accepted standards for data management and security, including, but not limited to, proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

268.    Additionally, Plaintiffs and Class Members make claims for actual damages, attorneys' fees, and costs.

## VII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, on behalf of themselves and the Class described above, seek the following relief:

      a.    An order certifying this action as a Class action, defining the Nationwide Class and Maryland Subclass as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Nationwide Class and Maryland Subclass requested herein;

b.  Judgment in favor of Plaintiffs and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c.  An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.  An order instructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

e.  An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.  A judgment in favor of Plaintiffs and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.  An award of such other and further relief as this Court may deem just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all triable issues.


DATED: October 24, 2023                 Respectfully submitted,

                                        */s/ Thomas A. Pacheco*
                                        Thomas A. Pacheco (Bar No. 1712140091)
                                        **MILBERG COLEMAN BRYSON**
                                        **PHILLIPS GROSSMAN, LLC**
                                        900 W Morgan Street
                                        Raleigh, NC 27603
                                        T: (212) 946-9305
                                        tpacheco@milberg.com

                                        David K. Lietz (admitted *pro hac vice*)
                                        *Interim Co-Lead Class Counsel*
                                        **MILBERG COLEMAN BRYSON**
                                        **PHILLIPS GROSSMAN, LLC**

5335 Wisconsin Avenue NW, Suite 440
Washington, D.C. 20015-2052
Tel: 202-744-1795
dlietz@milberg.com

Kevin Laukaitis*
*Interim Co-Lead Class Counsel*
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon, Suite 205, #10518
San Juan, PR 00907
T: (215) 789-4462
klaukaitis@laukaitislaw.com

Courtney L. Weiner (No. 1701270006)
*Interim Liaison Counsel*
**LAW OFFICE OF COURTNEY WEINER PLLC**
1629 K Street, NW, Suite 300
Washington, DC 20006
T: (202) 827-9980
cw@courtneyweinerlaw.com

Mason A Barney*
Tyler J. Bean*
**SIRI & GLIMSTAD LLP**
745 Fifth Ave., Suite 500
New York, NY 10151
Phone: (212) 532-1091
mbarney@sirillp.com
tbean@sirillp.com

A. Brooke Murphy*
**MURPHY LAW FIRM**
4116 Will Rogers Pkwy, Suite 700
Oklahoma City, OK 73108
Tel: (405) 389-4989
abm@murphylegalfirm.com

*Pro Hac Vice Motions Forthcoming

*Attorneys for Plaintiffs & Putative Class Members*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 24, 2023, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s. Thomas A. Pacheco*
Thomas A. Pacheco